IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-95 |
| HAROLD WILSON | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This case is before the Court on the defendant's Motion to Suppress Evidence [Doc. 11], filed on January 25, 2006. This motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on February 8, 2006. Assistant Untied States Attorney Hugh Ward was present representing the government. Attorney Paula Voss was present representing the defendant, Harold Wilson ("Wilson"). The defendant was also present. At the conclusion of the hearing, the defendant asked to file a post-hearing brief. The Court granted the defendant's request, but advised the parties that the Court would not await the receipt of post-hearing brief(s) before taking the motion under advisement. Accordingly, the Court took the suppression motion and related filings under advisement on February 9, 2006. The defendant filed a supplemental memorandum [Doc. 20] on February 22, 2006. The government filed a response to the defendant's supplemental memorandum [Doc. 21] on February 23, 2006.

1

# I. POSITION OF THE PARTIES

In his motion to suppress [Doc. 11], the defendant claims that he was illegally stopped and detained by members of the Blount County Drug Task Force on July 27, 2004 while parked at a Pilot gas station in Blount County, Tennessee. He argues that the officers, who were present at the gas station for the purpose of arresting Robert Andre Smith ("Smith") on an outstanding warrant, allegedly saw Smith speaking to Wilson, who was seated in a gray Buick parked next to Smith's red pickup truck. Wilson contends that the officers ordered him to stop when he began to back out of the parking space, and that a law enforcement vehicle parked behind his car to prevent him from leaving. Wilson further contends that the officers ordered him to stay where he was, and after removing Smith from the scene, the officers approached his car, looked inside and removed a baggie from inside the console of his vehicle which contained crack cocaine. Pursuant to a further search of Wilson's vehicle, officers also found a Copenhagen snuff can with additional crack cocaine inside.

The defendant has moved [Doc. 11 and 20] to suppress all items of evidence seized or statements given as a result of the detention, seizure, arrest and warrantless search of Wilson and his vehicle on July 27, 2004, alleging that: (1) the officers had neither probable cause nor reasonable suspicion to detain him; (2) as part of the detention, the defendant was illegally seized and then searched; (3) that the search of his car and the seizure of cocaine was illegal; and (4) that any statement given by him was either tainted by an illegal arrest, or in the alternative, the defendant was not properly advised of the Miranda warnings.

The government, in its written response [Doc. 13], described the events that transpired on July 27, 2004 very differently than the defendant. The government contended that the

2

officers observed Smith walk to and enter the passenger side of Wilson's Buick.[1] It claims that the officers observed Wilson in possession of a baggie of what appeared to be crack cocaine, and that as they approached closer, they observed the baggie in the console of the vehicle.[2] The government further contends that the officers apprehended Smith on the arrest warrant, seized the crack cocaine, and arrested Wilson. Incident to the arrest, the government contends that it discovered and seized additional cocaine from the vehicle.

The government argues that defendant Wilson's motion should be denied because: (1) the officers had reasonable and articulable suspicion to stop the defendant to investigate, what they observed to be, a drug transaction; (2) the officers possessed an articulable and objectively reasonable belief that the defendant had a weapon, and thus, were entitled to a Terry search of the vehicle and its occupant for weapons; (3) the seizure of crack cocaine from the console of the defendant's vehicle was lawful, as it was discovered during a legitimate Terry search, or in the alternative, it was observed in plain view; and (4) the seizure of the additional bag of cocaine, which was concealed in a Copenhagen snuff can sitting beside the console, was made during a search conducted incident to the defendant's arrest.

## II.  SUMMARY OF TESTIMONY

At the evidentiary hearing on this motion, the government called Officer Robert Nease ("Officer Nease") as its first witness. Officer Nease testified that he has been a narcotics agent with the Fifth Judicial District Drug Task Force for six years. This was also his assignment

---

[1] This contention was not borne out by the evidence and its inclusion in the government's brief was not satisfactorily explained by the government's attorney.

[2] See note 1.

3

on July 27, 2004.

Officer Nease testified that Robert Andre Smith was the subject of an investigation he conducted and that he had obtained arrest warrants on Smith for obtaining drugs by fraud. He testified that he asked a confidential informant, Jason Newton ("Newton"), who had bought crack cocaine from Smith in the past, to call Smith and arrange a "meet" location so he could arrest Smith on the warrant. Officer Nease testified that he was told by Newton that Smith wanted to meet at the Pilot gas station on Top Side Road to exchange the crack there. Officer Nease stated that, to his knowledge, Smith was not aware of the charges against him.

Officer Nease testified that he and his partner, agent Widener, followed Newton to the gas station in one vehicle and that other units assisted them. He stated that Newton was in his vehicle at the gas station when they arrived. Officer Nease then proceeded to illustrate on a large poster board the location of the gas station, entrances to the parking lot, parking spaces, and the location of the vehicles at issue in this case, which can be found as the government's Exhibit 1. Officer Nease testified that as they entered the gas station parking lot, they observed Smith's vehicle, a red pickup truck, parked front-wise in a parking space outside the gas station. In a parking space next to Smith's vehicle was Wilson's vehicle, a gray Buick. Officer Nease testified that both vehicles were parked side-by-side and facing forward. Officer Nease indicated that Newton's vehicle was not parked next to either Smith's or Wilson's vehicle, but was located on the other side of the building.

Officer Nease testified that as they entered the parking lot from Top Side Road, they observed Smith walking in front of the store back to these vehicles and then walk in between the red pickup truck and the gray Buick. Officer Widener pulled in behind the red pickup truck, and Officer

4

Nease exited the passenger side of the car and walked straight between the vehicles. Officer Widener, on the other hand, exited the driver's side of the patrol car and looped around to the front side of the vehicles. As Officer Nease approached, he stated that he saw another subject, who was subsequently determined to be Smith's wife, sitting in the driver's seat of the pickup truck. He also stated that he saw Wilson sitting in the driver's seat of the Buick, but did not see anyone else in the vehicle with him.

Officer Nease testified that when he approached Smith, Smith recognized him and said, "Hey, Officer Nease." At that time, Nease noticed Wilson turn and appear to be hiding or stuffing something which, in police work, he described as a furtive movement. Officer Nease stated that he then told Smith he had a warrant on him, pointed to Wilson and told him to put his hands where he could see them, and advised Officer Widener that Wilson was stuffing something. Officer Nease testified that he could not see what Officer Widener did after that because he took Smith to the rear of his vehicle to search him and place him under arrest on the warrants. Nease stated that he did not have any further dealings with Wilson. Officer Nease did, however, conduct a search of Smith's vehicle and found a crack pipe on the driver's side. Nease further noted that he did not see Newton again, and assumed Newton left once they made contact with Smith.

On cross-examination, Officer Nease confirmed that the informant he used, Jason Newton, reported that he had purchased crack cocaine from Smith prior to July 27, 2004. Officer Nease believed that the conversation between Newton and Smith had been recorded, but he was not prepared to testify to the contents of that recording. He did, however, confirm that Smith was at the Pilot gas station to sell drugs to Newton. He also confirmed that Smith was arrested for a drug deal on that day.

Officer Nease estimated that their car was parked ten (10) to fifteen (15) feet behind Smith's pickup truck and confirmed that the truck was pulled in front-wise. He stated that when Officer Widener stopped the car, he immediately jumped out. He noted that there were several other officers on the scene, but did not know their exact location. He also noted that Newton had arrived at the gas station probably four (4) to five (5) minutes before the officers due to traffic. Officer Nease agreed that he did not see Newton talking to Smith or Wilson, but acknowledged that Newton could have talked to them before the officers arrived. Nease did not remember either Smith or Wilson's car door being open, but agreed that the vehicles were parked very close together. Officer Nease confirmed that he did not see Smith in Wilson's car. He likewise confirmed that he did not see Smith talking to Wilson at that time, but noted that Wilson's window was down and Smith was standing in a position to where he could have engaged Wilson in conversation. Nease estimated that Smith was standing in that position for ten (10) to fifteen (15) seconds, and noted that Smith did not appear to be getting into his own vehicle.

Officer Nease testified that Smith did not try to run when Nease approached him. Nease stated that he could not remember whether Wilson's engine was running when he approached, but believed it could have been. He stated that Wilson did not, however, try to back up. Officer Nease stated that when he approached, he observed Wilson turn and, with his left arm, appear to be putting something away or hiding something. Nease confirmed that he could not see anything in Wilson's hands, as he was shielded by Wilson's back when Wilson turned. Nease likewise confirmed that he could not see into the car or into the console from where he was standing.

Officer Nease testified that the officers were in plainclothes and in unmarked cars. He stated that they did not have their blue lights activated, but he did have his necklace badge out.

Nease testified that upon observing Wilson make the furtive movement, he told Wilson to put his hands where he could see them. He remembered Wilson placing his hands on the steering wheel at that time, and agreed that Wilson did not try to flee or talk back.

Officer Nease indicated [Gov. Ex. 1] that Officer Widener looped around the front of the two vehicles while Nease walked in between the vehicles from the back side of the vehicles. He stated that they did this in case Smith decided to run. Nease agreed that they were not focusing on Wilson, and further admitted that he did not even know anyone was there until he was positioned between the vehicles. Officer Nease indicated that marked cars later arrived at the gas station, and that he placed Smith in the back of a patrol car that parked beside them.

On redirect examination, Officer Nease testified that after Smith was taken into custody, he asked Smith whether he knew Wilson, and Smith responded that Wilson was a friend. When asked what concerns he had regarding Wilson making a furtive movement, Officer Nease testified that his first thought was that Wilson might have a weapon. He stated that he did not, however, think about drugs at that time. He noted that Smith was known to always have small amounts of crack cocaine, and assumed that if any drugs were present, it would be on Smith's person. He acknowledged, however, that they did not find any drugs on Smith's person.

On recross examination, Officer Nease confirmed that once Smith was in custody, he was taken back to the station before he was questioned. He also admitted that he did not know who Wilson was when he observed the movement and was not expecting Wilson to be there. Furthermore, Nease admitted that what he expected was for Smith to meet with Newton, and that Smith might have drugs on him to sell to Newton.

The government next called Officer Marty Widener, who testified that he has been an investigator with the Fifth Judicial Drug Task Force for approximately four (4) years. Officer Widener stated that on July 27, 2004, he and Officer Nease were in his unmarked vehicle, which Widener was driving, when they arrived at the Pilot gas station. Officer Widener stated that Nease instructed him, as he approached from the front side of the vehicles, that the man in the Buick was hiding or stuffing something, and that Widener needed to check him. Widener stated that when he walked up to the driver's side of the Buick, he recognized the man as being Harold Wilson, or "H." When asked why he recognized him, he testified that he had been investigating Wilson's narcotics activities for a couple of years prior to that, and that he had a driver's license photo of Wilson in his possession. Widener agreed that he had not expected to see Harold Wilson that day, nor did he have Wilson's photograph with him at that time, but he nonetheless recognized Wilson when he saw him.

Officer Widener stated that he immediately asked Wilson to step out of his vehicle. He then conducted a light pat-down of Wilson's pockets for weapons and testified that there were no weapons on Wilson's person. Widener stated that, at that point, he was able to see into Wilson's vehicle and noticed that the center console was ajar. He observed the top of a cellophane baggie sticking out of the console, but stated that he could not see what was in the baggie. Counsel for the government then showed Officer Widener four photographs [Gov. Ex. 2-4], which Widener recognized as photographs taken of the inside of Wilson's vehicle. Officer Widener acknowledged that the baggie of crack cocaine and the snuff can, which were initially seized and removed from the vehicle, were placed back in the vehicle to take the photographs. He also noted that Photograph 2 [Gov. Ex. 2] did not show the baggie protruding from the console as he had found it.

Upon observing the cellophane baggie protruding from the console, Widener testified that he placed Wilson to the side and immediately went into the console to retrieve, what he believed to be, narcotics. When asked why he believed it was narcotics, Widener testified that from his experience and training, the cellophane baggie, which had a knot in the top, was consistent with the packaging of narcotics. He also knew Wilson and Smith to be narcotics sellers. Furthermore, Officer Nease had told Widener that Wilson had made a movement which made them afraid that Wilson might have a weapon in the vehicle.

Officer Widener testified that when he opened the console, he could clearly see that the baggie contained crack cocaine [Gov. Ex. 3]. He stated that the contents of the baggie were later submitted to a toxicologist, who determined that it contained 17.7 grams of crack cocaine. After Widener retrieved the baggie from the console, he stated that Wilson was immediately placed into handcuffs and was under arrest at that point. Next, Widener stated that he found, what he believed at the time to be, crack cocaine located inside a Copenhagen snuff can [Ex. 4]. He acknowledged, however, that it was later determined to be powder cocaine.

Widener testified that after Wilson was placed in handcuffs, but before they engaged in any in-depth conversation with him, Wilson was verbally advised of his rights. Widener indicated that Wilson did not state, either way, whether he wished to waive his rights. Widener stated that he explained to the defendant that he had the right to pick and choose the questions he could answer. Widener testified that Wilson understood his rights, and at that time, they began a conversation. Widener testified that Wilson told him he was in a bind because he was currently on probation and that if he was arrested he would go to federal prison. Wilson also indicated to Widener that if he was able to avoid going to prison that he could make a phone call and get two (2) kilos of cocaine

for them right then. Widener stated that this conversation took place at the scene. Officer Widener also testified that he recognized the photo, marked as Government Exhibit 5, which was a photograph of the crack pipe found in Smith's vehicle.

On cross examination, Officer Weidner testified that he could not recall who took the photographs, but noted that they were taken on the scene immediately after Wilson's arrest. He admitted that Government Exhibit 2 did not show what he saw that day. He confirmed that he could only see the cellophane baggie hanging out of the console, that he could not see in the baggie, and that he could not see any drugs in plain view. Officer Widener noted, however, that they were afraid there might be a weapon in the vehicle. Officer Widener agreed that Wilson was already out of the vehicle at that time. Widener stated that after he patted Wilson down, he asked him to stand to the front of his vehicle, on the sidewalk, so that Wilson was not right beside him. Widener testified that there were other officers on the scene, but he could not indicate where they were located.

Widener confirmed that Wilson exited the vehicle as he was asked, that he let Widener pat him down, that he stood in front of the vehicle, and that he did not try to break, run or flee. Officer Widener confirmed that Smith and Wilson's vehicles were parked very close together and that, initially, as he approached the vehicles, he was looking into the windshield of Wilson's vehicle and could not see much. Widener also confirmed that when he approached the side of Wilson's vehicle, he had to bend down to look inside the car, and even then, he could not see the console. Widener admitted that it was only after Wilson exited the vehicle that he noticed something sticking out of the console. He likewise admitted that what he observed sticking out of the console was not a weapon of any kind, and that he did not see anything that he would identify as a weapon.

Officer Widener confirmed that he advised Wilson of his Miranda rights, but stated that he did not know whether Smith was advised of his rights. Widener also confirmed that Wilson did not sign a Miranda warning form. Widener confirmed that Wilson did not give him consent to search his vehicle. Widener testified that he did not initially ask Wilson for consent to enter his vehicle, but stated that he did go back and ask Wilson for consent to search the rest of his vehicle and asked for consent to search his house. Widener stated that Wilson did not sign the consent forms and he did not verbally consent to the searches. However, Wilson's wife, Erica, later signed the consent to search the house. Widener indicated that no drugs were found at Wilson's house.

Officer Widener could not recall whether he further searched Wilson's person after he was placed under arrest, but stated that it would have been standard procedure. Widener also could not recall finding any money on Wilson. When asked whether he would expect to find money if this was supposed to be a drug deal, Widener stated that it depended on the stage of the drug deal. He noted that it was common for drug dealers and suppliers to front each other, and stated that it would not surprise him if no money was found.

Officer Widener confirmed that in his arrest report [Def. Ex. 1] he stated that agents had observed Smith in the parking lot speaking to a white female and a black male, who was sitting in a gray Buick, at the side of a Pilot gas station. When asked whether he actually observed Smith talking to either the female or Wilson, he stated that he could not recall that at this time, but indicated that if it was in his report then it was correct.

Officer Widener confirmed the statement in his report [Def. Ex. 1] that he had observed a large cellophane baggie containing crack cocaine in the center console of Wilson's vehicle. He explained, however, that when he first saw the baggie, he did not see the contents of

11

it. Widener stated that the contents were later identified as crack cocaine. He also confirmed the statement in his report indicating that he found an additional bag of crack cocaine concealed in a Copehagen snuff can. Officer Widener testified that he turned over the confiscated drugs, along with a lab request form [Def. Ex. 2], to the TBI lab. Reading from the form, Widener stated that he submitted one clear plastic bag containing eight (8) individual bags of crack cocaine and a second "clear plastic corner baggie" containing crack cocaine. Widener acknowledged that the lab results on the second baggie indicated that it actually contained 1.7 grams of powder cocaine.

Officer Widener confirmed that his report [Def. Ex. 1] does not state that Wilson was advised of his Miranda rights. Widener also stated that he could not recall whether Wilson was trying to back out of the parking space, but did confirm that Wilson was ordered to stay where he was and that he was not free to leave at that point. When asked whether one of the officers pulled up to block Wilson's vehicle in, Widener stated that it was possible.

On redirect examination, Officer Widener confirmed that he had received the TBI lab results [Gov. Ex. 6] on the substances he submitted. He likewise confirmed that one bag contained 17.7 grams of crack cocaine while the second bag contained 1.7 grams of powder cocaine. When asked to explain why the second bag appeared to him to be crack cocaine at the scene, Officer Widener stated that it was hard, like crack cocaine. Widener agreed that he was not a toxicologist and that he did know what the actual substance was until he received the TBI report.

When asked about the possibility of a police cruiser blocking in Wilson's vehicle, Officer Widener confirmed that it would not be inappropriate to block in the vehicle of someone who is under arrest. Nonetheless, Widener speculated that if an officer did park behind Wilson, the officer probably just wanted to get closer to the scene because Wilson was already out of the vehicle

at that time. Officer Widener stated that when he approached Wilson, he immediately asked him to step out of his vehicle, and he could not remember there being any police cruisers around him when he did this. Officer Widener also testified that he was aware that Wilson had been convicted in Texas on a cocaine charge.

On recross examination, Officer Widener agreed that he generated his report [Def. Ex. 1] very close to the time of the arrest. When asked how long it had been since he had seen Wilson's driver's license photo, Widener could not remember. Widener stated, however, that he had seen it several times during an investigation he was conducting into another drug organization, but agreed that he was not on the look-out for Wilson that day. Officer Widener also acknowledged that on July 27, 2004, he was not aware of Wilson's prior charge, but he was aware that Wilson had been implicated in a case involving two subjects who were intercepted with seven (7) kilos of cocaine in Texas. When asked whether Officer Widener followed up on the statements made by Wilson, Widener indicated that Wilson refused to cooperate any further when he found out he was going to jail. Widener agreed that Wilson's statement was not in his report, and noted that it was not in his report because they never followed up on it.

In their respective arguments, the defendant's attorney argued that the officers did not have reasonable suspicion to detain or probable cause to arrest Wilson. Attorney Voss contended that the officers were not expecting Wilson to be there, there was no indication that Wilson had been talking to Smith, and Smith was not seen in Wilson's vehicle. She also noted that while Officer Widener testified to seeing a driver's license photo of Wilson, he could not recall the last time he might have seen it. Attorney Voss questioned the so-called furtive movement and speculated that since Wilson had just come out of the market, he might have been putting his change

13

away.  She further noted that Officer Nease admitted that he could not see into the car.  She acknowledged the officers' concern about Wilson having a weapon, but questioned whether the officers knew Wilson well enough to make that judgment.  Attorney Voss argued that the facts of the case did not support a search of Wilson's vehicle because there was nothing, of an incriminating nature, in plain view and the officers did not have probable cause to perform a search.  Furthermore, she noted that there was no signed Miranda warning on record for Wilson, and thus argued that any statements Wilson made should be suppressed.

The government's attorney argued that, under Terry, the officers had reasonable and articulable suspicion justifying the investigative detention, seizure and pat-down of Wilson, for the following reasons: (1) the officers' informant had contacted Smith and set up a meet location with him at the Pilot gas station to exchange crack cocaine; (2) the officers expected Smith to be there and to have drugs on his person; (3) the officers saw Smith standing next to Wilson, who was sitting in a vehicle with his window down; (4) as Officer Nease approached the vehicles, he observed Wilson engage in a furtive movement; (5) when Officer Widener approached Wilson's vehicle, he recognized Wilson as a drug trafficking subject; and (6) the officers were concerned that Wilson may have been stuffing or hiding a weapon.  When asked about the baggie in the console, he indicated that once Wilson exited the vehicle, it was observed in plain view protruding from the console.  When asked how the incriminating nature of the baggie was immediately apparent, Attorney Ward stated that the packaging was consistent with how crack cocaine is packaged.  He also noted that the officers were aware that Smith was there to conduct a drug deal and that Wilson was observed in close proximity to Smith.  Furthermore, he contended that Wilson was Mirandized

after he was arrested and that there was no evidence to the contrary regarding the appropriateness of the Miranda warnings.

## III.  FINDINGS OF FACT

The Court makes its factual findings in the analysis section of the report.

## IV.  ANALYSIS

The defendant contends that his rights under the Fourth Amendment were violated because the officers had no right to stop him or subsequently to search his person or his car. Specifically, he argues that (1) the officers had neither probable cause nor reasonable suspicion to stop him on July 27, 2004, (2) once he was stopped, the officers had no basis to ask him to exit his vehicle or to frisk him, and (3) the search of his car was illegal.  Finally, he asserts that (4) all of his statement should be suppressed because the seizure of his person was illegal, or in the alternative, the statements were obtained without the defendant being properly advised of the <u>Miranda</u> warnings. The Court will examine each of these contentions in turn.

### A.  Propriety of the Stop and Seizure of the Defendant

The first issue the Court must address is whether the officers properly "stopped" the defendant on July 27, 2004.[3]  It is the government's contention that the officers had reasonable suspicion to the stop the defendant based upon the officers' observations, inferences and deductions

---

[3]  The Court notes that technically there was no stop *per se*.  The testimony indicates that the defendant was parked and the officers walked up to the defendant in his parked car.

that the defendant could be engaged in a drug transaction with Smith and that the defendant was hiding or stuffing a weapon.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. However, a temporary seizure under the Fourth Amendment is not unreasonable for investigative purposes, in what is referred to as a Terry stop, where the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur. Terry v. Ohio 393 U.S. 1, 20 (1968); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 543-44 (6th Cir. 2002). Under Terry, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. United States v. Martin, 289 F.3d 392, 398 (6th Cir. 2002). If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397.

The defendant argues that the officers basis for stopping him amounted to a hunch rather than reasonable suspicion and is therefore unlawful. The defendant contends that he was seized when Officer Nease ordered him to stay where he was and to place his hands where they could be seen. The defendant also maintains that a police cruiser was parked behind his vehicle to block its exit. The defendant contends that at that point, he was not free to leave.

The Fourth Amendment does not proscribe all contact between the police and citizens. Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 215 (1984). Law enforcement officers may approach and speak with an individual in a public place without interfering with the individual's Fourth Amendment rights so long as the individual feels he or she can freely leave. Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Taylor, 956 F.2d

572, 575 (6th Cir. 1992). The test for when the individual has been seized is whether, in view of all the circumstances surrounding the incident, a reasonable person would have felt he or she was not free to leave. United States v. Mendenhall, 446 U.S. 544, 553-54 (1980); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990).

The Court makes the following factual findings with regard to the stop in the present case:

*Findings of Fact:* A police informant, by the name of Jason Newton, set up a meet location with Robert Andre Smith at the Pilot gas station on Top Side Road to exchange crack cocaine on July 27, 2004. The meeting was arranged at the request of Officer Nease and for the purpose of arresting Smith on an arrest warrant for obtaining drugs by fraud. Smith had been the subject of an investigation conducted by Officer Nease and was known to Nease as someone who always had small amounts of crack cocaine on his person. Officer Nease and Officer Widener, who were following Newton in an unmarked car, arrived at the gas station approximately four (4) to five (5) minutes after Newton. Other officers, who were following Nease and Widener to the gas station, arrived shortly thereafter to provide assistance.

When Nease and Widener pulled into the parking lot, they observed the informant Newton sitting in a vehicle parked on the west side of the store. They also observed Smith, who was walking in front of the store when they arrived, walk in between two vehicles that were parked on the east side of the store. The vehicles located on the east side of the store were parked side-by-side, close together, and both vehicles were facing forward. One vehicle was a red pickup truck that belonged to Smith. The other vehicle was a gray Buick that belonged to the defendant. The officers pulled in behind Smith's vehicle and parked approximately ten (10) to fifteen (15) feet behind it.

17

The officers were dressed in plainclothes and did not have any lights activated.  Office Nease did, however, have his necklace badge out.  Officer Nease immediately exited the passenger side of the car and walked straight between the two vehicles toward Smith.  Officer Widener exited the driver's side of the car and looped around to the front of the vehicles.

As Officer Nease approached the vehicles, he observed a female sitting in the driver's seat of the pickup truck and the defendant sitting in the driver's seat of the gray Buick. Nease estimated that Smith had been standing in between the two vehicles for ten (10) to fifteen (15) seconds when they pulled in behind Smith's truck.  Nease did not observe Smith talking to the defendant, but the defendant's driver's side window was down and Smith was standing in a position to where he could have engaged the defendant in conversation.  Smith did not appear to be getting into in his own vehicle and the defendant was not attempting to back out of the parking space when Officer Nease approached.

As Nease was walking toward Smith, Smith recognized him and stated, "Hey, Officer Nease."  At that time, Nease observed the defendant turn away from him, and with his left arm, appear to be "hiding something or stuffing something."  Nease described this movement as a furtive movement.  Officer Nease could not see the defendant's hands because he was shielded by the defendant's back when the defendant turned.  Nease was concerned the defendant might have a weapon and instructed the defendant to put his hands where he could see them.  The defendant complied with Officer Nease's instruction and placed his hands on the steering wheel.  Officer Nease advised Officer Widener that the defendant was "stuffing something" and that Widener needed to check him.  Officer Nease then took Smith to the rear of his vehicle to place him under arrest on the warrants.  Acting on the information he had obtained from Officer Nease that the

18

defendant had stuffed something in the vehicle, Officer Widener approached the defendant, recognized him as being Harold Wilson, and immediately asked the defendant to step out the vehicle. The defendant complied. A police cruiser was not parked behind the defendant's vehicle at the time he was asked to exit his vehicle. [*End of Findings of Facts*].

The Court finds that the officers' show of authority in this case, in ordering the defendant to place his hands where they could be seen and then asking him to exit the vehicle, in addition to there being other officers on the scene at that time, would likely negate reasonable belief that defendant's compliance was not compelled. Thus, the Court concludes that under the circumstances a reasonable person would not have believed he could freely leave this encounter. Although arguably not stopped by the officers, the Court nevertheless finds that the defendant was seized either when he complied with Officer Nease's order to place his hands where they could be seen or, at the very least, when Officer Widener asked him to exit the vehicle. Accordingly, the Court finds that the earliest point at which the defendant could have been seized was when Officer Nease ordered the defendant to place his hands where they could be seen and the defendant complied. At that point, Officer Nease had to have reasonable suspicion to detain the defendant.

Concluding that a seizure occurred, the Court must now determine, under a totality of the circumstances analysis, whether the seizure was constitutionally permissible. In other words, the Court must determine whether Officer Nease had a reasonable suspicion, supported by articulable facts, that the defendant was engaged in criminal activity when he seized the defendant. Terry, 393 U.S. at 20; Farm Labor Org. Comm., 308 F.3d at 543-44. In evaluating the constitutionality of an investigative stop, the Court engages in a two-part analysis of the reasonableness of the stop. First, the Court asks, "whether there was a proper basis for the stop,

which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" of criminal activity. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993).

The government contends that Officer Nease had reasonable suspicion to seize the defendant based upon his belief that the defendant could be engaged in a drug transaction with Smith and that the defendant was hiding a weapon, stemming from his knowledge of the following: (1) Officer Nease has worked as a narcotics agent with the Fifth Judicial Drug Task Force for six years; (2) he expected Smith to be present at the gas station and to be in possession of crack cocaine; (3) Smith and Wilson's vehicles were parked very close together and the defendant's driver's side window was down; (4) Smith was observed standing in a position to where Smith could have engaged Wilson in conversation;[4] (5) Smith did not appear to be getting into his own vehicle; (6) as Officer Nease was walking toward Smith, Smith saw Nease and stated, "Hey, Officer Nease"; and (7) upon Smith making that statement, Officer Nease observed Wilson turn away from him and, with his left arm, appear to be hiding or stuffing something, which Nease described as a furtive movement. The defendant contends that Officer Nease's observations amounted to no more than a hunch because the officers were not expecting him to be there and there was no indication that he was talking to Smith. He also argues that the officers did not actually see anything of an incriminating nature in his hands. The defendant furthermore contends that many of the surrounding facts, such as the fact that he was parked next to Smith, that he had his window down, and that he

---

[4] The Task Force Report [Def. Ex. 1] indicates that the agents did observe a conversation. Although, at the hearing, Officer Nease denied observing such conversation and Officer Widener could not recall it. Officer Widener indicated, however, that if it was in his report then it was correct.

20

made a movement while sitting in his car, are merely innocent facts that do not amount to reasonable suspicion.

Initially, the Court notes that facts innocent in and of themselves can contribute to reasonable suspicion. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that seemingly innocent information can provide a basis for reasonable suspicion in light of an officer's training and experience). Furthermore, even if the isolated facts and circumstances in this case could arguably be deemed innocent, the Court does not view them in isolation. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993). Instead, when reviewing a challenge to an investigative stop, the Court assesses the reasonableness of the officer's suspicion that criminal activity "may be afoot" in light of the totality of the circumstances, giving due weight to specific reasonable inferences which officers are entitled to draw from the facts. United States v. Bailey, 302 F.3d 652, 658 (6th Cir. 2002); see also United States v. Jones, 75 Fed.Appx. 334, 337-38 (6th Cir. 2003) (holding that "[o]fficers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person"). The likelihood of criminal activity "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Zabawa, 134 Fed.Appx. 60, 62 (6th Cir. 2005) (quoting Arvizu, 534 U.S. at 273). In other words, there must be a "minimal level of objective justification" for making the stop. United States v. Moreno, 43 Fed.Appx. 760, 764 (6th Cir. 2002).

The government does not argue that reasonable suspicion existed solely on the basis of Officer Nease's observations of the defendant alone. Rather, the government invokes the "totality of the circumstances" and argues that based on the facts enumerated above, and the factual inferences

and deductions that Officer Nease was entitled to draw from the cumulative information available to him, there was reasonable suspicion to believe that the defendant was engaged in a drug transaction. The Court also notes that the Sixth Circuit has recognized the association between drugs and weapons and has held that officers "could rely on the teaching of experience that weapons are frequently used in drug transactions." United States v. Gahagan, 865 F.2d 1490, 1499 (6th Cir. 1989).

Thus, the Court finds, giving due weight to Officer Nease's experience and specialized training as a narcotics agent, that (1) Nease expected Smith to be at the gas station on July 27, 2004 to conduct a drug transaction and to be in possession of crack cocaine, (2) Smith was observed standing close to the defendant, who had his window down, (3) Nease observed the defendant make furtive movements after Smith arguably alerted the defendant that Officer Nease was approaching when he said, "Hey, Officer Nease," and (4) Officer Nease was standing in close proximity to, what he observed and deduced could be, an attempt by the defendant to conceal a weapon. Based on the foregoing, the Court finds that Officer Nease had reasonable suspicion to believe that Wilson could be involved with Smith, that criminal activity was afoot, and that the defendant could be hiding a weapon. More specifically, the Court finds that Wilson's furtive actions, coupled with his proximity to Smith and Smith's vehicle, and joined with the fact that Smith was there for the purpose of conducting a drug transaction provides the requisite reasonable suspicion for the officers to conduct a Terry investigation. However, as the facts hereinafter indicate, the Terry investigation was actually accomplished by Officer Widener, whose knowledge of the defendant and the defendant's link to drug activities, only adds to the objective reasonableness necessary for the Terry stop, questioning, and patdown.

22

Accordingly, the Court finds based on the totality of the circumstances, including the information known to the officers as set forth above along with reasonable inferences that could be drawn from the cumulative information available to them at the time of the stop, that the officers had reasonable, objective suspicion to conduct a <u>Terry</u> investigation. Thus, the defendant's seizure was constitutionally permissible.

### B. Propriety of the Detention and Frisk

Having concluded that the basis for the investigative stop was proper, the Court must next determine whether the detention was reasonable, that is, (1) was it sufficiently time limited, and (2) were the investigative means used the least intrusive means reasonably available." <u>Bennett v. City of Eastpointe</u>, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted). The defendant contends that Officer Widener did not have the requisite reasonable suspicion to order the defendant to exit his car or to frisk him. He argues that Widener's alleged recognition of him as a narcotics seller was not a valid basis to warrant that degree of intrusion. The government contends that Officer Widener had specific and articulable facts causing him to believe the defendant could be armed and dangerous and that ordering the defendant to exit the vehicle and conducting a frisk was warranted.

When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range is armed and dangerous. <u>Terry</u>, 392 U.S. at 26-27; <u>United States v. Walker</u>, 181 F.3d 774, 778 (6th Cir. 1999). "[T]he officer need not be absolutely certain that the individual is armed; the issue is

whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger." <u>Terry</u>, 392 U.S. at 27; <u>see</u> <u>also</u> <u>United States v. Thomas</u>, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005). In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." <u>United States v. Vite-Espinoza</u>, 342 F.3d 462, 466 (6th Cir. 2003). In determining whether an officer's suspicion of danger and subsequent conduct are reasonable, "due weight must be given, not to his unchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>Terry</u>, 392 U.S. at 27. Moreover, the Sixth Circuit has held that in an investigatory stop situation where police officers have reason to believe that an occupant of a vehicle is armed and dangerous, the officer may order an occupant from a car for their own safety. <u>Garza</u>, 10 F.3d at 1246.

The Court finds the following facts based upon Officer Widener's testimony:

*Findings of Fact:* After the defendant was observed making a furtive movement and was instructed to place his hands where they could be seen, Officer Widener approached the defendant from the front side of the vehicle. Officer Widener has been a narcotics agent with the Fifth Judicial Drug Task Force for four (4) years. When Officer Widener saw the defendant, he recognized the defendant as Harold Wilson, or "H." Officer Widener had been "investigating narcotics activities" from the defendant for a couple of years prior to July 27, 2004 and had a driver's license photo of the defendant. Officer Widener did not have the photo in his possession at that time and was not expecting to see the defendant at the gas station. The defendant and Smith were known to Officer Widener as being narcotics sellers. Officer Widener knew that the defendant

24

had been implicated in a case involving two subjects who were intercepted with seven (7) kilos of cocaine in Texas. He did not know, however, whether the defendant had been charged in that case. Officer Widener was afraid that the defendant might have a weapon in the vehicle and immediately asked the defendant to step out of his vehicle. Widener then performed a "light pat-down" of the defendant's pockets to make sure there were no weapons on his person. No weapons were found on the defendant. [*End of Findings of Fact*].

Initially, the Court notes that it has already found that both officers had reasonable suspicion to believe that the defendant could be involved with Smith, that criminal activity was afoot, and based on the "furtive movement" that Officer Nease observed the defendant make, there was legitimate concern that the defendant could be hiding a weapon. See Gahagan, 865 F.2d at 1499 (holding that officers "could rely on the teaching of experience that weapons are frequently used in drug transactions"). Furthermore, the Court finds that Officer Widener could point to facts which would justify a "prudent officer under the circumstances" in believing the defendant might be armed and dangerous. Specifically, Officer Widener (1) recognized the defendant as a narcotics seller from a previous narcotics investigation; (2) Widener knew Smith was a narcotics seller; (3) (3) Widener had just been advised that the defendant had made a furtive movement and might be hiding something; and (4) the officers were standing in close proximity to someone who, based on their observations and experience, might be concealing a weapon.

Additionally, a driver's furtive movement has been held, in part, to support a finding of reasonable belief of danger when there are facts actually and immediately linking the suspect to known dangerous activities. See United States v. Butcher, No. 92-3987; 92-4011, 1993 WL 272450 *6 (6th Cir. July 19, 1993) (unpublished per curiam) (under seat gesture combined with

identification of vehicle as one associated with gunfire within last two hours supports reasonable suspicion); United States v. Evans, 994 F.2d 317, 321 (7th Cir. 1993) (under seat gesture combined with location of stop in front of reported drug house in high crime area supports reasonable suspicion).

In the present case, the Court finds that (1) Smith was a narcotics seller who was present at the gas station to conduct a drug deal, (2) Defendant Wilson was known to Officer Widener as a narcotics seller, (3) both Smith's and Wilson's cars were parked next to each other, (4) Wilson, immediately following Smith's arguable alert regarding the presence of law enforcement officers, was observed making a furtive movement towards the center console of his car, and (5) both officers were standing in close proximity to Wilson. Based upon the Sixth Circuit's recognition of the association between drugs and weapons, and the fact that officers have the right to pursue their investigation without fear of violence, the Court finds that the defendant's furtive movement, coupled with the officer's concern that it might involve the hiding of a weapon and defendant's perceived involvement with Smith, supports a finding of reasonable belief of danger.

The Court finds that considering all these circumstances, giving due weight to the inference that weapons are frequently involved in drug transactions, and the fact that Officer Widener immediately recognized the defendant and could link the defendant to drug activities, Officer Widener reasonably believed that the defendant was potentially armed and dangerous. Thus, Officer Widener could certainly order the defendant to exit the vehicle and conduct a limited pat-down, or frisk, for weapons. The Court further notes that neither the manner of the frisk, nor the length of detention, is before the Court. Accordingly, the Court finds that the seizure was sufficiently limited in duration and Officer Widener's frisk of the defendant was proper.

### C. Propriety of the Automobile Search

Having found that Officer Widener could have reasonably believed the defendant was potentially armed and dangerous, and that the frisk of the defendant was therefore proper, the Court now turns to the propriety of the automobile search. The defendant argues that after he was stopped and an initial pat-down revealed no weapons on his person, it was unlawful for the officers to search his vehicle. The government, by contrast, argues that a search of Wilson's vehicle following the initial pat-down of his person was justified either as a permissible extension of <u>Terry</u> or under the plain view doctrine. It further argues that the second search of Wilson's vehicle was justified as a search incident to a lawful arrest.

The rationale of <u>Terry</u> has been extended to permit limited searches of the vehicle's passenger compartment where a police officer possess a reasonable belief based on "specific or articulable facts, which taken with rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. <u>Michigan v. Long</u>, 463 U.S. 1032, 1049 (1983). The scope of the protective search may include those areas in which a weapon may be placed or hidden. <u>Long</u>, 463 U.S. at 1049. The Supreme Court has recognized that a suspect may break away from police control and retrieve a weapon from his vehicle. <u>Id.</u> At 1051; <u>see also</u> <u>United States v. Paulino</u>, 935 F.2d 739, 747 (6th Cir. 1991) (holding that six police officers on scene separating suspect from cooler possibly containing weapon did not obviate need for protective search of vehicle). Furthermore, an officer may also anticipate allowing the suspect to reenter the vehicle after the stop, at which time the suspect may retrieve any hidden weapons. <u>Long</u>, 463 U.S. at 1051-52. Moreover, the Sixth Circuit had held that

"[t]he 'patdown' of a vehicle need not be predicated on the discovery of a weapon on a suspect's person." United States v. Slater, 81 F.3d 162, 1996 WL 143460 * 3 (6th Cir. March 28, 1996) (citing United States v. Holified, 956 F.2d 665, 668-69 (7th Cir. 1992)); see also Evans, 994 F.2d at 321, and Butcher, 1993 WL 272450 at *6, (finding that furtive movement coupled with facts linking suspect to known dangerous activities, justified Terry search of vehicle).

The Court makes the following findings of fact with regard to the search of the defendant's car:

*Findings of Fact:* Officer Widener was afraid that the defendant could have a weapon in the vehicle. After he frisked the defendant, Widener asked the defendant to stand on the sidewalk to the front of the vehicle, so that the defendant was not right beside him when he searched the defendant's vehicle. Other officers were on the scene at that time, but Officer Widener was not sure of their exact location. Once the defendant was out of the vehicle, Officer Widener could see that the center console of the vehicle was ajar and observed the top of a cellophane baggie protruding from it. He then "immediately [went] into the console to retrieve what [he] believe[d] to be narcotics." He also entered the defendant's vehicle because "[Officer] Nease had stated that [the defendant] had made a movement, and [they] were afraid there might be a weapon in the vehicle." Although Officer Widener could see a cellophane baggie protruding from the console, he could not see the contents of the baggie. After he removed the baggie from the console, however, he could clearly see that the baggie contained crack cocaine. He then handcuffed the defendant and placed him under arrest. Once the baggie was seized from the console of the vehicle and Wilson was arrested, Officer Widener conducted a second search of the vehicle and found, what he believed

was, crack cocaine located inside a Copenhagen snuff can that was sitting beside the console in plain view. [*End of Findings of Fact*].

The Court finds that the same factors that justified the initial pat-down of Wilson supplied reasonable belief that the defendant was potentially armed and dangerous and justified Officer Widener's search of the interior of Wilson's vehicle to ensure the officers' safety. The fact that Wilson was standing at the front of his vehicle, and that he was possibly under the control of other officers who were at the scene, does not detract from the fact that the defendant may have been able to access a weapon in his vehicle readily. Because Wilson would have been permitted to reenter his vehicle if he had not been arrested, and would have had immediate access to any weapons inside, the Court finds that it was reasonable for Officer Widener to check the passenger compartment of Wilson's vehicle for weapons even though a pat-down revealed none on his person. Furthermore, the Court finds that the center console of a vehicle is easily assessable to the driver of that vehicle and is an area where a weapon may be placed or hidden.

Concluding that Officer Widener was justified in conducting a protective search of the passenger compartment of Wilson's vehicle, the Court likewise concludes that Widener was not required to ignore contraband discovered in the console of Wilson's vehicle during that search. United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002) (citing United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999) (contraband discovered during legitimate Terry search may be seized without warrant). The Court had already found that the defendant made a furtive movement toward the center console of the vehicle and that Officer Nease advised Officer Widener of the situation prior to the search. Thus, the Court finds that the console was a place in which the defendant could have placed or hidden a weapon, and was arguably the first place that Officer Widener should have

29

looked even if he had not observed a baggie protruding from it. Regardless, Officer Widener was not required to ignore contraband while conducting a protective search of Wilson's vehicle for weapons and thus the evidence should not be suppressed.

Furthermore, the Court finds that once the baggie of drugs was seized from the console of Wilson's vehicle and Wilson was arrested, both he and his car could be subjected to a complete search incident to arrest for both weapons and evidence. New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Montgomery, 377, F.3d 582, 586 (6th Cir. 2004). Thus, the cocaine that Officer Widener discovered in the Copenhagen snuff can was properly seized pursuant to a search incident to Wilson's arrest.

Having found that the evidence should not be suppressed for the above reasons, the Court will only briefly address the government's contention that the seizure of the baggie from the console was also justified under the plain view doctrine. To seize evidence in plain view without a warrant, the evidence must be "(1) in plain view, (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994). The Court has already found that while Officer Widener could see the top of a baggie protruding from the console, he could not, however, see the contents of the baggie until he went into the console to retrieve it. Thus, the Court does not agree with the government's argument, to the extent it makes the argument, that the officer's view of the baggie constituted "plain view" so as to authorize entry into the defendant's vehicle. Specifically, the Court finds that the character of the baggie, as seen before the search, was not immediately incriminating.

Accordingly, the Court finds that the only legal basis for the officer's entry into the defendant's car was based on the fact that Officer Widener could have reasonably believed the defendant was potentially armed and dangerous, justifying a <u>Terry</u> patdown, and that the defendant could gain immediate control of a weapon located in the defendant's vehicle, justifying a <u>Terry</u> search of the vehicle. Although this search resulted fortuitously in the discovery of the cocaine, the issue is one of authorization to search and not what was found.

### D. Admissibility of the Defendant's Statements

The defendant contends that any statement he made after he was seized on July 27, 2004 should be suppressed because either the seizure of his person was illegal, or in the alternative, he made the statements while in custody and without being properly advised of the <u>Miranda</u> warnings. The government contends that the seizure of the defendant was proper and that the defendant was properly advised of the <u>Miranda</u> warnings after he was arrested.

The Firth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966); <u>see</u> <u>also</u> <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes at trial." <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994); <u>Salvo</u>, 133 F.3d at 948.

The Court finds the following facts occurred with respect to questioning of and statements made by the defendant after he was arrested:

31

*Findings of Fact:* After Officer Widener seized the baggie of crack cocaine from the console of Wilson's vehicle, the defendant was arrested and secured in handcuffs. Officer Widener then proceeded to conduct a second search of the defendant's vehicle. Sometime after the defendant was placed in handcuffs, but before he was engaged in any in-depth conversation with the officers, the defendant was verbally advised of his Miranda rights. The defendant did not indicate, either way, whether he wished to waive his rights. Officer Widener further explained to the defendant that he had the right to pick and choose the questions he could answer. Officer Widener believed the defendant understood his rights, and at that time, the officers began a conversation with the defendant. During the course of that conversation, the defendant stated that he was in a bind because he was currently on probation and that if he was arrested he would go to federal prison. The defendant also stated that if he was able to avoid going to prison, he could make a phone call and get two (2) kilos of cocaine for the officers right then. Once the defendant learned that he was going to jail, he refused to cooperate with the officers any further. The defendant was advised of his rights and made these statements while he was still at the gas station. The defendant was not asked to sign a Miranda warning form and Officer Widener did not memorialize his reading of the Miranda rights in his report. [*End of Findings of Fact*].

*1. Presence of Miranda Warnings*

The Court has already rejected the defendant's contention that he was not properly seized above. Thus, the defendant's statements were not tainted by an illegal seizure and should not be suppressed on that basis. The Court will next address the defendant's contention that he was not properly advised of the Miranda warnings. In the defendant's post-hearing brief [Doc. 20], he

32

argues that the officers failed to comport with the requirements of <u>Miranda</u>. Specifically, the defendant contends that he was only told that he could "pick and choose" questions to respond to and that he was never told that any of the statements he might make could be used against him. He further argues that while "there is no mandate that 'magic words' be used, there is a requirement that all elements of <u>Miranda</u> be conveyed." Additionally, the defendant argues that there is no record that the officers gave him the warnings. He noted that it is typical practice for the officer to have a defendant sign a rights form and memorialize the reading of the <u>Miranda</u> rights in the officer's report.

The defendant is correct that law enforcement officers are not required to give warnings that precisely track <u>Miranda's</u> language as long as all elements of <u>Miranda</u> are conveyed. <u>United States v. Ellis</u>, 125 Fed.Appx. 691, 698 (6th Cir. 2005). In the present case, Officer Widener's testimony does not indicate to the Court that the <u>Miranda</u> warnings given to the defendant were defective. Officer Widener stated that the defendant was verbally advised of his "rights" and then later testified that the defendant was specifically advised of his "<u>Miranda</u> rights." Widener also testified that the defendant understood these rights. Officer Widener was not asked whether he read the <u>Miranda</u> warnings from a prepared card, nor was he asked the exact language he used. In any event, the Court does not find that Officer Widener only told the defendant that he had the right to pick and choose the questions he could answer. Rather, the Court finds that (1) the defendant was verbally advised of his rights, (2) when the defendant did not indicate, either way, whether he wished to waive his rights, then (3) Officer Widener, before engaging in a conversation with the defendant, further explained to the defendant that he had the right to pick and choose the questions he could answer, and (4) the defendant understood his rights. The Court finds that Officer

Widener's "pick and choose" language is more in line with an attempt to inform an individual that they can assert their right to remain silent as to any question asked, even after they have waived their Miranda rights. This alone does not indicate to the Court that the defendant was never told that any statements he might make could be used against him. The Court also observes that once the defendant learned that his cooperation with the officers was not going to keep him from going to jail, he refused to cooperate with the officers any further.

The Court finds that the testimony of Officer Widener is credible and unimpeached. Accordingly, the Court finds that Officer Widener did properly advise the defendant of the Miranda warnings and that the defendant agreed to talk to the officers after being warned of his rights.


*2. Voluntariness of Statements*

The Court has already rejected the defendant's contention that he was not properly advised of the Miranda warnings. The Court also notes that the defendant did not specifically raise the issue of whether the statements he made during his July 27, 2004 conversation with Officer Widener were voluntarily given. Thus, the Court finds that while the government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence, United States v. Miggens, 302 F.3d 384, 397 (6th Cir.), *cert. denied*, 537 U.S. 1130 (2002), the evidence in this case indicates that the defendant voluntarily made the statements in an effort to try and effect a deal with the officers. Furthermore, there is absolutely no proof that the statements were not voluntary. In fact, based on the limited evidence, the Court cannot even find whether the statements were given pursuant to a custodial interrogation or whether the statements were spontaneous or voluntarily offered by the defendant without being responsive to a question.

34

## V. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case, or to suppress the statements made by the defendant. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [Doc. 11] be **DENIED**.[5]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).